DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a judgment of conviction and sentence entered by the Fulton County Court of Common Pleas after defendant-appellant was found guilty of
 {¶ 2} three counts of rape and two counts of gross sexual imposition. From that judgment, appellant raises the following assignment of error:
 {¶ 3} "The trial court's verdict finding defendant/appellant, Douglas Curry, guilty on three counts of rape and two counts of gross sexual imposition is against the manifest weight of the evidence."
 {¶ 4} On September 20, 2001, appellant was indicted and charged with four counts of rape and three counts of gross sexual imposition as a result of allegations that he engaged in sexual conduct and had sexual contact with Danielle B., being less than 13 years old, between the dates of February 5, 2000 and December 24, 2000. Appellant waived his right to a trial by jury, and on August 12, 2002, the case proceeded to a trial to the court. At that trial, the following evidence was presented.
 {¶ 5} Danielle B., who at the time of the trial was 11 years old, testified that until recently she lived with her father Tom and step-mother Joy Rhoda, along with six step or half siblings. Danielle stated that during the time that she lived with those family members, appellant, who is Joy's uncle, lived across the street. Also during that time, appellant frequently baby-sat Danielle and her siblings on weekends. Danielle stated that around the time that her step-mother, Joy, went to jail for hitting her and her brother Derrick with a belt, appellant began engaging in sexual conduct with her. Danielle described in detail instances in which appellant touched her "privates" with his hand and penis, removed her underwear, put his "private" and his finger in her "private" and was "humping" her. In addition, Danielle stated that "white stuff" came out of appellant's
 {¶ 6} penis and that when she asked him to stop, appellant responded "Danielle, come on, please." Danielle further testified that appellant put his hands and mouth on her chest. She then stated that these instances happened "a lot" and specified that appellant put his "private" into her "private" while in the back bedroom, his room and in the living room. Although Danielle's siblings were in the house when these offenses occurred, Danielle stated that they were always in another room and that appellant's wife, Estella, was at work. Danielle further testified that appellant told her to keep this a secret and that she did keep it a secret for some time. Eventually, however, Danielle told her step-mother, Joy, who then took her to the police and a doctor.
 {¶ 7} Joy Rhoda also testified at the trial below. She stated that from December 1999 to June 14, 2002, she and her husband Tom had custody of Danielle as well as six other children that were either Tom's or theirs together. During that time period, her uncle, appellant, would occasionally baby-sit the children on the weekends while she and Tom worked. Joy further testified that the children occasionally spent the night at appellant's home and that appellant's wife often worked until 11:00 at night. She also stated that appellant's wife often paid bills in person on Saturdays prior to going to work and so would be away from the house during that time as well. Joy testified that on February 5, 2000, she was arrested for domestic violence and, as a result, Tom asked appellant to watch the children for a couple of hours. When she returned home the children were at appellant's home. Joy further testified that on December 24, 2000, Danielle left to spend the Christmas holiday with her mother and that she returned home on December 29, When she returned home, Danielle revealed to Joy that appellant had been sexually abusing her. Over the next several days, Joy questioned Danielle from time to time about the abuse to determine the extent of it. On January 8, 2001, Joy called the Wauseon Police Department, after which Lieutenant Brad Weber came to their home to question Danielle. Subsequently, Joy took Danielle to Dr. W. David Gemmill for a medical evaluation. Initially, a nurse questioned Danielle about the abuse and took notes. The doctor, however, was not present during that questioning.
 {¶ 8} Dr. Gemmill was the state's final witness. Dr. Gemmill is a medical doctor and the director of the Child Maltreatment Program at Mercy Children's Hospital. In that position, he performs medical examinations of children suspected of having been sexually abused. Dr. Gemmill explained that the typical procedure for evaluating such children includes a medical interview, in which information about the offense is obtained, a medical history and a physical exam. He then testified that he first saw Danielle B. on March 9, 2001, after she was referred to his clinic by the Fulton County Department of Job and Family Services for a medical evaluation relative to issues of child sexual abuse. She was first interviewed by Darla Vogelpole, Dr. Gemmill's nurse at the time. Dr. Gemmill then conducted a genital exam of Danielle, after which he concluded that she had an abnormal hymen. In particular, Dr. Gemmill testified that Danielle had very little hymen remaining, that the abnormality was consistent with a previous painful experience, and that that abnormality would only occur by some blunt object being pushed into the vaginal area. Although he testified that there was no way of knowing what the object was, he stated that it could be a penis or finger. Dr. Gemmill further testified that children consistently delay reporting sexual abuse.
 {¶ 9} At the conclusion of the state's case, appellant presented the testimony of three witnesses. Gene Peters, appellant's best friend, testified that he regularly visited appellant at his home on the weekends and that he recalled appellant babysitting Danielle and her siblings. Peters testified that the children were at appellant's home two or three weekends per month, that he never saw appellant act in any sexual way toward Danielle and that he never saw the children spend the night at appellant's home. He also stated that other adults were occasionally in the home. He then described Danielle as a needy person who paid a lot of attention to appellant. He recalled that appellant's wife, Estella, often worked weekends and denied that she ran errands on Saturdays. He did admit, however, that there were times when he would arrive at appellant's home and Estella would be gone.
 {¶ 10} Constance Nofziger was also a friend of appellant. She too testified that she frequently visited appellant at his home on the weekends. She recalled Danielle and her siblings being at the home and stated that occasionally Gene Peters was also there. Nofziger testified that she usually visited in the afternoon after she got off of work at around 2:30 p.m. and that the children were often already there when she arrived. She further stated, however, that she never saw appellant sexually assault Danielle and never saw Danielle sit on appellant's lap, although she did describe Danielle as sometimes craving appellant's attention.
 {¶ 11} Finally, in an attempt to challenge Danielle's memory, appellant called Dr. David Lowenstein to testify. Dr. Lowenstein is a licensed psychologist with an expertise in the areas of child sexual abuse, emotional abuse, investigative and interviewing techniques in those types of cases, and child memory and development. Dr. Lowenstein first testified as to how the human brain creates a memory, stating that people can either witness an event and have a memory of it or can be told of an event and have a memory if it. When there are holes in our memory, Dr. Lowenstein stated that our brains are very good at filling in the spaces, sometimes with correct information but more often with incorrect information. In this regard, Dr. Lowenstein testified that sometimes a person can be told of an event so many times that they actually believe that they experienced it even if they did not. Because of that risk, Dr. Lowenstein stated that to determine if a child's memory is reliable, the interview of that child must be conducted in a non-leading manner and must be carefully crafted to avoid contaminating the child's memory. Dr. Lowenstein also stressed the importance of videotaping the interview of a child when dealing with a possible abuse situation. Dr. Lowenstein then testified that he had reviewed documents related to this case, namely police reports from the Wauseon Police Department, an investigative report by J and K Investigators, information from an interview conducted by a Detective Miller, and a time line. Based on his review of this information, Dr. Lowenstein testified that he was very concerned about the reliability of the accusations in this case. In particular, he noted that Detective Miller's interview was not videotaped, Danielle was asked leading questions, Joy questioned Danielle for four days about the
 {¶ 12} accusations before notifying the authorities, and there were inconsistencies between the initial report and Danielle's trial testimony. On cross-examination, however, Dr. Lowenstein admitted that he did not talk to Detective Miller about his interview of Danielle, did not know Detective Miller's or Lieutenant Weber's training and background regarding child interview techniques, and he could not say that Detective Miller's questioning planted false memories in Danielle. He also admitted that it was common for children to disclose sexual abuse a little at a time.
 {¶ 13} After the parties had submitted their evidence to the court, the court took a short break and then returned, finding appellant guilty of three counts of rape and two counts of gross sexual imposition. The court explained that while it found some of the aspects of the state's case to be troubling and was deeply impressed with Dr. Lowenstein's testimony, it did find Danielle to be truthful in her testimony and found Dr. Gemmill's testimony to be corroborative of Danielle's testimony. The court then found that the testimony had convinced him beyond a reasonable doubt that appellant did insert his penis into Danielle's vagina on at least three occasions, once on the couch in the front room, once in the back room and once on the bed. He further found that appellant once licked his finger and inserted it into Danielle's vagina and once fondled and sucked her breast. He therefore found sufficient evidence to sustain the allegations of rape as indicted in Count I, Count II and Count III and the allegations of gross sexual imposition as indicted in Count V and Count VI. The court dismissed Counts IV, VII and VIII.
 {¶ 14} On January 9, 2003, the lower court issued a judgment entry sentencing appellant to five years imprisonment on each count of rape, the sentences to run consecutively, and two years imprisonment on each count of gross sexual imposition, the sentences to run concurrently to one another and concurrently to the sentences on the rape convictions, for a total sentence of 15 years. It is from that judgment that appellant now appeals.
 {¶ 15} In his sole assignment of error, appellant asserts that the trial court's judgment was against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "`* * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. The rule of law in Thompkins applies equally to a matter tried before the bench or a jury. State v. Fisher, 6th Dist. No. L-02-1041, 2002-Ohio-7305, at ¶ 7.
 {¶ 16} Appellant contends that his conviction was against the manifest weight of the evidence because the state failed to present evidence that would substantiate a conviction beyond a reasonable doubt. In particular, he asserts that Danielle's testimony was inconsistent and that Dr. Lowenstein's testimony created a reasonable doubt as to the reliability of Danielle's memory.
 {¶ 17} We have carefully reviewed the record in this case, including the transcript of the trial below and the applicable law, and cannot conclude that the court clearly lost its way and created a manifest miscarriage of justice in convicting appellant of three counts of rape, as that crime is proscribed by R.C.2907.02(A)(1)(b), and two counts of gross sexual imposition, as that crime is proscribed by R.C. 2907.05(A)(4). The court took into consideration Dr. Lowenstein's testimony but ultimately concluded that Danielle was credible and that her accusations were corroborated by Dr. Gemmill. Accordingly, the sole assignment of error is not well-taken.
 {¶ 18} On consideration whereof, the court finds that appellant was not prejudiced or prevented from having a fair trial and the judgment of the Fulton County Court of Common Pleas is affirmed. Court costs of this appeal are assessed to appellant.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Pietrykowski, J., Singer, J. Concur.